**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| SARAH A. NICKLES ) | CASE NO:    5:07-cv-1542 |
| ) | |
| Plaintiff, ) | |
| ) | JUDGE JOHN R. ADAMS |
| v. ) | |
| ) | MAGISTRATE JUDGE |
| MICHAEL J. ASTRUE, ) | NANCY A. VECCHIARELLI |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | **REPORT & RECOMMENDATION** |

Plaintiff Sarah A. Nickles ("Nickles") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Nickle's claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.

For the reasons set forth below, the Magistrate Judge recommends that the final decision of the Commissioner be VACATED and REMANDED for further proceedings consistent with

this Report and Recommendation.

## I. Procedural History

On April 2, 2004, Nickles filed an application for POD, DIB, and SSI alleging a disability onset date of September 10, 2002, and claiming she was disabled due to pain stemming from her back that causes a loss of sensation in her left leg.[1] Nickles's application was denied initially and upon reconsideration. Nickles timely requested an administrative hearing.

On May 8, 2006, Administrative Law Judge Dean K. Franks ("ALJ") held a hearing during which Nickles, represented by counsel, testified. Lynn Smith testified as the vocational expert ("VE"). On June 29, 2006, the ALJ found Nickles was able to perform a significant number of jobs in the national economy, and therefore, was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review. Nickles filed an appeal to this Court.

On appeal, Nickles claims the ALJ erred by: (1) failing to evaluate whether Nickles met or equaled Listing 1.04(A); (2) making an RFC finding that was not supported by substantial evidence; (3) relying on the VE's testimony where the hypothetical posed to the VE was inaccurate; and (4) failing to call a medical expert ("ME") to testify at the hearing.

## II. Evidence

*Personal and Vocational Evidence*

Born on September 25, 1980 and age twenty-five (25) at the time of her administrative hearing, Nickles is a "younger" person. *See* 20 C.F.R. § 404.1563(c) & 416.963(c). Nickles has

---

[1] At the hearing, Nickles's attorney amended the alleged disability onset date to May 1, 2003. (Tr. 14.)

a high school education and does not have any past relevant work.

*Medical and Evidence*

On September 10, 2002, Nickles visited Norton A. Winer, M.D., for a neurologic consultation. (Tr. 199-204.) Nickles complained of a prickly and numb sensation on the left lateral thigh area. (Tr. 200.) Motor testing revealed normal strength in all extremeties. (Tr. 202.) Sensory examination revealed hyperalgesia, allodynia, and hyperathia in the cutaneous distribution of the left lateral femoral cutaneous nerve. *Id*. Reflexes were present and equal bilaterally. *Id*. Nickles had full range of motion and the ability to heel and toe walk. *Id*. Dr. Winer opined that Nickles's examination was consistent with left meralgia paresthetica, which was most likely secondary to compression of the left lateral femoral cutaneous nerve as it passes over the pelvic rim. *Id*. Dr. Winer advised Nickles that the sensory abnormality may last for three to four months and recommended Neurontin. (Tr. 203.)

On October 10, 2002, Nickles had a follow-up with Dr. Winer. (Tr. 197-198.) Dr. Winer noted that an EMG and nerve conduction velocity study were indicative of meralgia paresthetica or possibly lumbar radiculopathy. (Tr. 197.)

On May 11, 2003, a CAT scan demonstrated a mild diffuse disc bulge at L5-S1 with mild narrowing of the canal and the neural foramina – "findings most consistent with bilateral pars defects consistent with spondylolysis without significant spondylolisthesis. (Tr. 130.)

In May of 2003, Nickles was referred to Rajiv V. Taliwal, M.D., an orthopedic surgeon, to address pain in her back and numbness in her bilateral buttocks and posterior thighs and calves. (Tr. 134.) Dr. Taliwal diagnosed lumbar sponylolysis with leg radiculopathy. *Id*. His treatment suggestions included physical therapy and weight reduction. *Id*.

On September 18, 2003, Nickles was seen by orthopedic surgeon Jeffrey S. Tharp, D.O. (Tr. 169.)  Dr. Tharp noted that Nickles walked with a relatively normal gait and had good strength with heel and toe ambulation.  *Id*.  X-rays demonstrated spondylisis at L5 bilaterally with mild narrowing of the L5 disc space.  (Tr. 170.)  Her reflexes were present, pinprick sensation was intact, motor strength was full, and straight leg raise was negative.  *Id*.  Dr. Tharp's impression was ischemic spondylisis at L5 bilaterally with lumbar disc disease causing mechanical back pain.  *Id*.  (Tr. 170.)

On October 3, 2003, an MRI was performed on Nickles's lumbar spine.  (Tr. 137.)  The MRI indicated normal vertebral height, alignment, and marrow signal, but also indicated desiccation of the L5-S1 disc without disc space narrowing.  *Id*.  There was a mild broad-based diffuse disc bulge at L5-S1 without central canal stenosis, thecal sac compression, nerve root compression, or foraminal stenosis.  *Id*.  Mild, bilateral facet hypertrophic changes were seen at L4-5 and L5-S1.  *Id*.

On October 9, 2003, Dr. Tharp saw Nickles and reviewed the results of the MRI.  (Tr. 167.)  An EMG was planned to determine if there is a component of radicular pain.  *Id*.  Nickles failed to appear for three subsequently scheduled visits.  *Id*.

On October 16, 2003, Steven Cremer, M.D., examined Nickles.  (Tr. 162.)  The examination revealed Nickles's reflexes, motor strength, and sensation were intact.  *Id*.  Straight leg raising was negative, but lumbar range of motion was limited with moderate paraspinal tenderness.  *Id*.  Nerve conduction studies of Nickles's lower extremities revealed no abnormalities.  *Id*.

On February 19, 2004, Mark Verdun, D.O., examined Nickles and found she had full

4

range of motion of her lumbar spine with pain and tenderness to palpation over the lumbosacral junction. (Tr. 142.) Sensation in her left thigh was decreased but otherwise intact. *Id*. Dr. Verdun reported that the MRI performed in October 2003 had shown a "broad based herniated disc at L4-5 with slight right sided foraminal stenosis and slight central canal stenosis. There appears to be no nerve root compression." *Id*. Dr. Verdun diagnosed degenerative disc disease at L5-S1, herniated nucleus pulposus at L4-5, and spinal stenosis. *Id*. He recommended aquatic and land-based physical therapy and an increased dosage of Celebrex. *Id*.

Between March and April of 2004, Nickles attended a few physical therapy sessions in March and April 2004 and reported slight pain reduction with therapy. (Tr. 145-49.) However, Nickles failed to attend several scheduled sessions. *Id*.

On April 22, 2004, Nickles told Robert J. Hampton, M.D., that she was "no better, though she does get some temporary relief when she goes to physical therapy." (Tr. 141.) Dr. Hampton scheduled Nickles for epidural blocks and recommended continuing physical therapy. *Id*.

On October 8, 2004, Gerald W. Klyop, M.D., reviewed Nickles's medical records for the State Agency and completed an RFC Assessment form. (Tr. 153-60.) He concluded that Nickles could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk about six hours in an eight-hour day, sit about six hours in an eight-hour day, and could occasionally climb, balance, stoop, kneel, crouch or crawl. (Tr. 154-55.)

On October 24, 2005, Dr. Hampton informed Nickles that he would no longer treat her after she missed three scheduled appointments. (Tr. 172-73.)

On November 15, 2005, Dr. Winer examined Nickles and opined that she was slightly

5

obese and in some mild distress. (Tr. 190.) He found that Nickles had good leg strength, but had some pain in her left leg on straight leg raising and some pain with left lateral flexion of the lumbosacral spine. *Id*. X-rays of Nickles's lumbar spine revealed no abnormality (Tr. 194.) Dr. Winer's impression was low back strain and probable recurrent left lumbar radiculopathy. (Tr. 190-91.) He recommended Naproxen and Soma and planned an EMG. *Id*.

On November 28, 2005, Dr. Winer reported that a lumbar MRI showed lumbar disc disease at L4-5 and L5-S1 (Tr. 182.) Dr. Winer also completed an RFC questionnaire. *Id*. Dr. Winer opined that Nickles could work for eight hours a day with four hours of sitting, one hour of standing, and one hour of walking. (Tr. 183.) He further found that she occasionally could lift and carry up to 10 pounds, occasionally bend, reach, stoop, and crouch, but never squat, crawl, climb, or kneel. (Tr. 184.) He opined that Nickles should not be exposed to unprotected heights and could occasionally be exposed to moving machinery, temperature changes, dust/fumes/gases, and noise. (Tr. 185.) Nickles had no manipulative restrictions. (Tr. 184.) Dr. Winer stated that Nickles suffers from muscle spasms and moderate pain, which would cause her to miss work about twice a month. (Tr. 185.)

On January 17, 2006, an EMG and nerve conduction study indicated probable bilateral L4-5 and L5-S1 radiculitis. (Tr. 176-77.) Dr. Winer scheduled Nickles for a lumbar nerve block and prescribed Darvocet and Flexeril. (Tr. 175.)

An April 26, 2006, an MRI of Nickles's lumbosacral spine indicated degenerative changes with a moderate size bulge of the disc at L5-S1 that is relatively centrally directed. (Tr. 215.) The consulting radiologist, Albert Cook, M.D., indicated that the bulge did not appear to be impinging on the right nerve root. *Id*.

6

On April 25, 2006, Dr. Winer completed a second RFC questionnaire. (Tr. 206-08.) Dr. Winer opined that Nickles could perform four hours of work in an eight-hour work day, including four hours of sitting and one hour of standing/walking. (Tr. 206.) Nickles's ascribed postural, environmental, and lifting limitations remained unchanged from Dr. Winer's November 2005 RFC questionnaire. (Tr. 207-08.) *Id.* Dr. Winer again indicated that Nickles suffered from muscle spasms and moderate pain, which would cause her to be absent from work about twice per month. (Tr. 208.)

*Hearing Testimony*

At the hearing, Nickles testified to the following. She worked as a cashier/stocker at Home Depot in 2002 and discontinued working when she became pregnant. (Tr. 226.) She had two children – one eight months old and the other three years old. (Tr. 230.) Her husband and her family helped care for the children. (Tr. 230-31.) She cannot work because she cannot "do anything without having excessive pain." (Tr. 227.) Her pain stemmed from her back, shot up to her neck, and down to her left leg. *Id.* She suffered from spasms, numbness, and, at times, could not walk. *Id.* She stated that her situation had remained unchanged for about three and one-half years, since May 2003. *Id.* Her pain was the same at the time of the hearing as it was in May 2003. (Tr. 235.)

Nickles testified that she took several medications, which often caused dizziness, fatigue, and stomach problems. (Tr. 230-36.) At times, she tried to avoid taking the medications with the worst side effects so that she could attend to her daily needs and her children. (Tr. 230.) She has not received epidural injections and was "against" them because she heard they were addicting and did not provide a cure. (Tr. 232.) She stated that she stopped going to physical

7

therapy because it was not helping alleviate her pain. *Id.* She also stated that she wanted to avoid surgery because she was afraid of the risks involved. (Tr. 238.) She fed her children, played with them, and did light activities. (Tr. 230.)

Nickles limited her lifting activities and only briefly lifted her children to transfer them into chairs and such. (Tr. 231.) She further testified that she could not lift a gallon of milk or any groceries. (Tr. 241.) She estimated that she could walk "[l]ess than a couple houses without hurting my left leg" and could sit for "[m]aybe five minutes." (Tr. 233.) She went grocery shopping with her husband, did light cooking, and helped with the dishwasher. (Tr. 238-39.) She stated that talking on the phone hurts. (Tr. 239.) She could not sit in a chair with too much cushioning because it caused pain and spasms. (Tr. 240.) She opined that she could function less than two hours per day. (Tr. 240-41.)

The ALJ asked the VE to answer questions based on the following hypothetical: an individual with a high school education and no past relevant work; who could lift 20 pounds occasionally and 10 pounds frequently; and who could perform occasional postural movements including stooping, kneeling, crawling, crouching, climbing, or balancing. (Tr. 241.) The VE testified that the specified limitations did not significantly erode the full range of light work. (Tr. 241-42.) The VE indicated that the hypothetical individual could perform light, unskilled jobs such as information clerk (650 jobs locally; 36,000 in Ohio; 1 million nationally) or mail clerk (800 jobs locally; 31,000 in Ohio; 750,000 nationally). (Tr. 242.) The ALJ asked the VE to assume another hypothetical: a person who could lift or carry up to ten pounds; who required a stand/sit option; and who could occasionally bend, reach, stoop, or crouch. *Id.* The VE testified that such a person could perform some sedentary, unskilled jobs such as ticket checker (650 jobs

8

locally; 69,000 in Ohio; and 1.7 million nationally) or polisher of eye-glass frames (1,000 locally; 4,800 in Ohio; 300,000 nationally). (Tr. 242-43.)

In response to a question posed by Nickles's attorney, the VE testified that it would be hard for either of the individuals described in the ALJ's hypotheticals to maintain employment if they missed three or more days of work per month due to medical problems. (Tr. 243-44.) Nickles's attorney asked the VE what impact the addition of a sit/stand option would have on the ALJ's first hypothetical. (Tr. 246.) The VE responded that such an individual still could perform the information clerk job and other jobs, such as office helper (about 1,400 jobs locally; 3,200 in Ohio; 111,000 nationally), but could not perform the mail clerk job. (Tr. 246-47.)

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[2]

---

[2] The entire five-step process entails the following: First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*,

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Nickles was insured on her alleged disability onset date, May 1, 2003 and remained insured through June 30, 2003.  (Tr. 21.)  Therefore, in order to be entitled to POD and DIB, Nickles must establish a continuous twelve month period of disability commencing between May 1, 2003 and June 30, 2003.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant is entitled to receive SSI benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

The ALJ found Nickles established a medically determinable, severe impairment, due to spinal stenosis with degenerative impairments, but her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Nickles is

---

905 F.2d 918, 923 (6th Cir. 1990).

unable to perform her past work activities because she lacks past relevant work, but has a Residual Functional Capacity ("RFC") for a limited range of light work. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Nickles is not disabled.

## V. Standard of Review

The court's review of the Commissioner's decision is limited to determining whether there is "substantial evidence" to support the Commissioner's decision and whether the Commissioner employed proper legal standards in reaching his or her conclusion. Because the petitioner's request for review has been rejected, the decision of the ALJ is the final decision of the Commissioner and is subject to this court's review. Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *see also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). If substantial evidence for the Commissioner's decision exists, the Court's "inquiry must terminate" and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

Furthermore, if the Commissioner's decision is supported by substantial evidence, the Commissioner's determination must stand regardless of whether the reviewing court would resolve the disputed issues of fact differently. *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

## VI. Analysis

Nickles claims the ALJ erred by: (1) failing to evaluate whether Nickles met or equaled

Listing 1.04(A); (2) making an RFC finding that was not supported by substantial evidence; (3) relying on the VE's testimony where the hypothetical posed to the VE was inaccurate; and (4) failing to call a medical expert ("ME") to testify at the hearing.  Each will be discussed in turn.

**Listing 1.04(A)**

Nickles argues that the ALJ erred by not evaluating whether she had met Listing 1.04(A) and that her testimony, coupled with the medical evidence, established that she had met the Listing.  (Pl.'s Br. at 8-9.)  Nickles fails to cite any authority suggesting that an ALJ must explicitly discuss any particular Listing in his or her decision.  Therefore, the lack of any discussion concerning Listing 1.04(A) in the ALJ's opinion does not give rise to a cognizable issue.  The remainder of Nickles's argument also lacks merit.  Nickles avers that "it is [her] opinion that [she] meets 1.04(A) ... [and that] medical evidence and [her] testimony establish that she meets the listing. "  (Pl.'s Br. at 9.)   Nickles then cites portions of the record that she believes support her position.  The Court construes this argument as an assertion that, essentially, the ALJ should have made a different finding.  This is tantamount to an invitation for the Court to conduct a *de novo* review of the facts and come to a different conclusion than the ALJ.  This Court declines to do so.

Even if the Court were to construe Nickles's argument as one suggesting that the ALJ's decision concerning Listing 1.04(A) was not supported by substantial evidence – an argument that Nickles does not make – it still would lack merit.  Listing 1.04(A) reads as follows:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral frracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic

> distribution of pain, limitation of motion of the spine, motor loss (atrophy
> with associated muscle weakness or muscle weakness) accompanied by sensory
> or reflex loss and, if there is involvement of the lower back, positive straight-leg
> raising test (sitting and supine);

20 C.F.R. Pt. 404, Sbpt. P, App. 1 § 1.04.

Although Nickles contends that she has satisfied the terms of this Listing due to a herniated disc and/or a bulged disc, the Commissioner disagrees. The Commissioner avers that the medical evidence does not support a finding that Nickles suffered from a herniated disc or had a concomitant motor loss, reflex loss, or positive straight leg raising test. (Def.'s Br. at 12-15.) The burden is upon Nickles to proffer evidence demonstrating that she meets or equals a listed impairment. *See Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987) (per curiam); *Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). A claimant must bring forth evidence that his condition satisfies all of the requirements of the pertinent listing. *See Hale v. Sec'y of Health & Human Servs.*, 816 F.2d 1078, 1083 (6th Cir. 1987). The majority of the physicians who examined Nickles and/or her test results did not find that she had a herniated disc.[3] Listing 1.04 does not indicate that a bulged disc satisfies the Listing's definition of spinal disorders.

Therefore, there is substantial evidence supporting a finding that Nickles did not meet Listing 1.04(A).

*RFC Finding*

Nickles argues that the ALJ's RFC finding was not supported by substantial evidence

---

[3] Two separate MRIs from 2003 indicated that Nickles suffered from a mild diffuse disc bulge. (Tr. 130, 137.) Dr. Tharp's review of the MRI did noted degenerative discs but no herniation. (Tr. 167.) Also, Dr. Winer's review of Nickles's MRI revealed lumbar disc disease but made no mention of a herniated disc. (Tr. 182.)

because it was contrary to the findings of her treating physician, Dr. Winer.  (Pl.'s Br. at 10-13.)  However, an ALJ need not accord any special significance to the opinion of treating physician on an issue that is ultimately decided by the Commissioner, such as the determination of a claimant's RFC.  *See* 20 C.F.R. §§ 404.1527(e)(2),(3); 416.927(e)(2),(3).  In addition, the opinion of a non-treating physician also may constitute substantial evidence capable of supporting the Commissioner's decision so long as it is consistent with the evidence of record.  *See Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1987) (*per curiam*).  Here, the ALJ's RFC finding was supported by the opinion of Dr. Klyop.  Therefore, the mere fact that Dr. Winer's opinion is inconsistent with the ALJ's RFC finding does not render the ALJ's finding unsupported by substantial evidence.

Nevertheless, Nickles also argues that the ALJ erred by rejecting the opinion of Dr. Winer a treating physician, which, she asserts, should have been accorded controlling or substantial weight.  (Pl.'s Br. at 10-13.)  However, in order for the treating physician's opinion to be entitled to substantial weight, the opinion must be more than a conclusory statement and must be supported by clinical or diagnostic findings.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981).  Where no such medical documentation is presented and there is no explanation of a nexus between the conclusion of disability and physical findings, the ALJ may choose to disregard the treating physician's opinion.  *See Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 212 (6th Cir. 1986).  The ALJ also must consider factors such as the "length;" "nature and extent of the treatment relationship;" the physician's specialty; and the "consistency" and "supportability" of the physician's opinion.  *See* 20 C.F.R. §§ 404.1527(a)-(d), 416.927(a)-(d).  The ALJ can disregard the opinion of a treating physician which is not

supported by adequate medical data, including medical signs and laboratory evidence. *Id.* The ALJ need not credit a treating physicians conclusion which does not contain substantiating medical data. *See Villarreal v. Sec'y of Health & Human Servs.,* 818 F.2d 461, 463 (6th Cir. 1987).

The ALJ explicitly rejected the April 2006 assessment proffered by Dr. Winer, a treating physician. In the April 2006 assessment, Dr. Winer opined that Nickles could perform only four hours of work in an eight-hour work day, including four hours of sitting and one hour of standing/walking. (Tr. 206.) Dr. Winer also found that Nickles could lift/carry ten pounds occasionally but could not lift/carry any weight frequently. *Id*. The ALJ gave the following reasons for rejecting Dr. Winer's April 2006 opinion: (1) the medical assessment was not accompanied by treatment notes, which would lend support; (2) Dr. Winer appears to merely reiterate Nickles's subjective allegations; (3) the medical assessment is not compatible with the assessment of state agency physician Dr. Klyop; (4) there are curious inconsistencies between Dr. Winer's November 2005 and April 2006 opinions; and (5) there is no objective basis for the opinion that Nickles cannot lift any amount on a frequent basis. (Tr. 17.)

However, the ALJ's reasons, taken as a whole, are insufficient to justify rejecting the limitations imposed by Dr. Winer. Dr. Winer's April 2006 assessment was not an independent or new evaluation, but rather a revision or correction of his November 2005 evaluation. (Tr. 206.) The letter from Nickles's counsel to the ALJ indicated that the latter assessment was merely a revision. (Tr. 205.) Therefore, the ALJ's first rationale for rejecting Dr. Winer's opinion – namely that treatment notes did not accompany the April 2006 evaluation – is an insufficient reason if the latter assessment merely corrected mistakes contained in the November

15

2005, which in fact was accompanied by treatment notes.

In addition, the ALJ's rationale that there are curious inconsistencies between the November 2005 and April 2006 assessments again ignores the remedial nature of Dr. Winer's April 2006 assessment. The lone substantive difference between the two opinions is the number of hours Dr. Winer opined that Nickles could work in one day. (Tr. 182-85; 206-08.) The December 2005 evaluation stated that Nickles could work for eight hours in an eight-hour work day despite also stating that Nickles could only sit for four hours and stand/walk for one hour in an eight-hour day – an aggregate of only five hours. (Tr. 182-85.) Dr. Winer's first assessment that Nickles could work for eight hours is at odds with his opinion in that same assessment that Nickles's could only sit, stand or walk for a total of no more than five hours in an eight-hour workday. Thus, Dr. Winer's second assessment dated April 2006 appears to attempt to rectify this obvious error by reducing the number of hours Nickles can work to four hours in an eight-hour workday.[4] (Tr. 206.) In his April 2006 assessment, Dr. Winer again opined that Nickles could only sit for four hours and stand/walk for one hour in an eight-hour day. (Tr. 206.) Because Dr. Winer's second assessment clearly attempted to cure an internal mathematical inconsistency in his first assessment, the ALJ's rejection of Dr. Winer's latter opinion, without any detailed explanation or analysis, on the basis that it differed from the earlier opinion that Dr. Winer sought to remedy is an unreasonable basis for rejecting a treating physician's opinion.

The ALJ also rejected Dr. Winer's opinion because he believed that Dr. Winer merely reiterated Nickles's subjective allegations and took them at face value. (Tr. 17.) Certainly, an

---

[4] The Court notes that Dr. Winer's revised assessment did not completely cure this error, as the aggregate number of hours he found Nickles could sit, stand or walk exceeded her overall ability to work by one hour.

ALJ can reasonably reject the opinion of treating physician who is doing a favor for a patient by ascribing greater limitations than those warranted by the objective medical evidence.[5] The ALJ, however, failed to give any explanation or reasoning for such a conclusion. The guidelines require that an ALJ set forth good reasons for rejecting a treating physicians opinions and case law gives ample explanation of what constitutes a good reason. These guidelines would be severely undermined if an ALJ could summarily dismiss the opinion of treating physician, who finds limitations consistent with those alleged by a claimant, simply because an ALJ finds the claimant to be lacking in credibility. The ALJ's failure to fully articulate his reasoning deprives this Court of the ability to conduct any meaningful review.

This Court does not find that the ALJ's conclusion is untenable, but rather that the ALJ failed to explain his conclusion. While the court does not require a perfect opinion, it does ask for a logically consistent one. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("we cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544-546 (6th Cir. 2004) (finding it was not harmless error for the ALJ to fail to make sufficiently clear why he rejected the treating physician's opinion, even if substantial evidence

---

[5] Treating physicians can sometimes be biased in favor of the patient. *See Butera v. Apfel*, 173 F.3d 1049, 1056 (7th Cir. 1999) (noting a claimant's regular physician may want to do a favor for a friend and client, and so may too quickly find disability); *Tokarz v. Sec'y of Health & Human Servs.*, No. 88-2210, 1989 WL 90766, at *2 (E.D. Mich. Aug. 11, 1989) (noting the ALJ identified inconsistencies in the doctor's reports and concluded that his reports were neither credible nor supported by adequate documentation. The doctor also demonstrated a tendency to be biased in favor of claimant and was willing to modify his reports to establish claimant's disability).

not mentioned by the ALJ may have existed to support the ultimate decision to reject the treating physician's opinion).

Finally, the ALJ also rejected Dr. Winer's opinion because it was inconsistent with the opinion of Dr. Klyop, a non-examining physician who reviewed Nickles's record at the request of the State Agency.  (Tr. 17.)  The opinions of treating physicians should be given greater weight than those of physicians hired by the Commissioner.  *See Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048 (6th Cir. 1983).  "The opinion of a non-examining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physician." *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  Therefore, a contrary opinion of a non-examining physician, without more, is an inadequate reason to reject the opinion of a treating physician.

The Commissioner also argues that Dr. Winer's opinion, as a whole, was not supported by the underlying medical evidence.  (Def.'s Br. at 15.)  The ALJ, however, did not proffer this reason for rejecting Dr. Winer's opinion.[6]  It is the opinion given by an administrative agency rather than counsel's "post hoc rationale" that is under the Court's consideration.  *See NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 715, n.1, 121 S. Ct. 1861, 1868 (2001), *citing NLRB v. Yeshiva Univ.*, 444 U.S. 672, 685, n. 22, 100 S. Ct. 856 (1980); *see also Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("we cannot uphold a decision by an administrative agency ... if,

---

[6] The ALJ cited a lack of objective medical evidence *only* as a reason for rejecting Dr. Winer's limitations concerning Nickles's alleged inability to lift or carry any weight frequently and not as a rationale for rejecting the remainder of Dr. Winer's opinion.  (Tr. 17.)  Thus, the Court finds the ALJ adequately explained his reason for rejecting this one particular aspect of Dr. Winer's opinion as he expressly stated that there is no objective evidence supporting such a drastic lift/carry limitation and cited Nickles's medical records.  (Tr. 17.)

while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.")

For the foregoing reasons, the ALJ failed to give good reasons for rejecting Dr. Winer's opinion and this matter should be remanded so that the ALJ can give a more detailed explanation, one that complies with the regulations, concerning the weight ascribed to Dr. Winer's opinions.

*Vocational Expert*

Nickles argues that the VE's testimony did not constitute substantial evidence because it was given in response to an inaccurate hypothetical. (Pl.'s Br. at 13-14.) A hypothetical question must precisely and comprehensively set out every physical and mental impairment of the applicant that the ALJ accepts as true and significant. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the hypothetical question is supported by the evidence in the record, it need not reflect unsubstantiated allegations by claimant. *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). Because the Court is unable to determine whether the ALJ reasonably rejected the opinions of Dr. Winer, it would be premature to address the issue of whether the ALJ's hypothetical accurately reflected Nickles's impairments.

*Medical Expert*

Nickles further argues that the ALJ erred by failing to obtain the testimony of an ME. (Pl.'s Br. at 14-15.) It is within the ALJ's discretion whether to consult an ME at a claimant's hearing. *See* 20 C.F.R. § 404.1529(b). The only time an ALJ is required to consult an ME is when the ALJ makes a finding of medical equivalence under the listings. *See* 20 C.F.R. §§

19

404.1526(b) and 416.926(b).  Here, the ALJ did not make a finding of medical equivalence regarding Nickles's impairments, so he was not required to obtain the services of a ME.  Although the opinion of an ME may have been helpful to the ALJ, the ALJ's failure to consult an ME was not erroneous.  Nevertheless, upon remand, the ALJ, at his or her discretion, may obtain the testimony of an ME or hold a new hearing if he or she deems it is necessary.

## VII.  Decision

For the foregoing reasons, the Magistrate Judge finds the decision of the Commissioner not supported by substantial evidence, as the ALJ failed to follow proper procedures in his analysis of the opinions of treating physicians.  Accordingly, the decision of the Commissioner should be VACATED and the case REMANDED for further proceedings consistent with this Report and Recommendation.

/s/ Nancy A. Vecchiarelli_____
U.S. Magistrate Judge

Date: February 29, 2008

**OBJECTIONS**
**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**